UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Norman H. Schulman, M.D.,
Susan Schulman,

   Plaintiffs,

   v.             Civil Action No. 2:13-cv-193

Saloon Beverage, Inc. d/b/a
Sirloin Saloon, DWH I, LLC,
Susan Schulze-Claasen,

   Defendants.

## ORDER
(Doc. 55)

  Plaintiffs Norman H. Schulman, M.D. and Susan Schulman (the Schulmans) have filed this action against the above-captioned Defendants under Vermont's Dram Shop Act (DSA), 7 V.S.A. § 501, and Vermont common-law theories, alleging that Defendants' sale of beer to Mark R. Clarke (Clarke) caused the February 18, 2011 head-on collision between the vehicle that Clarke was operating and the Schulmans' vehicle. (*See* Doc. 13.)[1]  Defendants deny that Clarke entered the Sirloin Saloon or consumed beers there on the night in question.  (*See* Doc. 14 at 4, ¶¶ 41–42, 44.)  In an Opinion and Order dated January 14, 2014, the Court granted in part and denied in part Defendants'

---

[1] The corporate Defendants—Saloon Beverage, Inc. d/b/a Sirloin Saloon (Saloon Beverage) and DWH I, LLC (DWH)—were allegedly consolidated entities and alter egos of each other.  (*See id.* at 4, ¶¶ 20, 22, 26.)  The individual defendant, Susan Schulze-Claasen, was allegedly the owner and president of the corporate Defendants.  (*Id.* at ¶¶ 17, 18, 22.)

Motion for Judgment on the Pleadings (Doc. 15), concluding that the Schulmans' common-law claims were preempted by the DSA, but that the DSA claim itself was not time-barred. (Doc. 52.)

Currently pending is the Schulmans' Rule 37 Motion for Sanctions (Doc. 55). In that Motion, the Schulmans argue that the only documentary evidence to prove that Clarke was at the Sirloin Saloon on February 18, 2011 would be the records of checks that the Sirloin Saloon issued to its customers that night.[2] The Schulmans contend that Defendants should be sanctioned for allegedly failing to preserve or permitting the destruction of those records. (*See* Doc. 55-1 at 5–6.)

All parties have consented to direct assignment to the undersigned Magistrate Judge. (Docs. 2, 3, 7.) The Court held a hearing on the Schulmans' Motion on April 10, 2014. For the reasons that follow, the Schulmans' Motion for Sanctions is DENIED.

### Factual Background and Procedural History

Many of the essential allegations of the Schulmans' Amended Complaint appear in the Court's January 14, 2014 Opinion and Order. (*See* Doc. 52 at 2–3.) Briefly, the Schulmans allege that, after drinking heavily during the day of February 18, 2011, Clarke stopped at the Sirloin Saloon in Manchester, Vermont while on his way to Connecticut. According to the Amended Complaint, Clarke sat at the bar alone, where he was attended

---

[2] The Schulmans say that they "have reason to believe that Clarke paid cash" for the beers he allegedly drank at the Sirloin Saloon that night. (Doc. 55-1 at 14.) Thus apparently Clarke's credit card records do not establish his presence at the Sirloin Saloon. The Vermont Department of Liquor Control (VDLC) investigated the collision, but it is undisputed that VDLC has represented that it does not have any documents relating to the accident. (*See id.* at 26; *see also* Doc. 61-7, Ex. G, Cory Aff. ¶ 6.)

to by a male bartender, and where he ate and drank three or four more beers. (Doc. 13 at 7, ¶ 41.) Clarke then allegedly left the Sirloin Saloon and resumed driving southbound on U.S. Route 7. Between 9 and 10 p.m., after traveling for less than ten miles, he fell asleep behind the wheel and collided with the Schulmans' vehicle. (*Id.* at 5, ¶ 28; *see also id.* at 7, ¶ 43.)

The Amended Complaint further alleges that, after the collision, Clarke fled the scene and ran towards the woods, but was apprehended by a responding police officer. Clarke was screened for DUI at the scene and his breath sample was .215%. He failed a field sobriety test at the scene and was placed under arrest. Clarke admitted to the police that he had recently consumed "3 to 4 Sierra Nevada draft beers at the Sirloin Saloon in Manchester VT." (*Id.* at 6, ¶ 33.)

The following additional facts are relevant to the Schulmans' Rule 37 Motion; disputes are noted where necessary.[3] As of February 18, 2011, Defendant DWH maintained Defendant Saloon Beverage as an insured entity under DWH's general liability and liquor liability policies. (*Id.* at 5, ¶ 25; Doc. 14 at 3, ¶ 25.) On April 21, 2011, DWH and Saloon Beverage filed voluntary petitions for bankruptcy protection. (Doc. 13 at 2, ¶¶ 6, 10; Doc. 14 at 2, ¶¶ 6, 10.) In the initial bankruptcy filing, Norman Schulman and his attorney, Lawrence Rosenblatt, were identified as creditors of the Sirloin Saloon. (*See* Doc. 55-14 at 14–15.) On or about

---

[3] No evidentiary rulings are included in the following recitation. The Court simply includes the factual allegations proffered by the parties.

December 18, 2011, the Sirloin Saloon ceased operations.  (*See* Doc. 55-1 at 15, ¶ 37; *see also* Doc. 55-7, Ex. 5, Dunne Dep. 12:1–2; Doc. 55-8, Ex. 6, Marantz Dep. 17–18.)

The police officer who apprehended Clarke was Vermont State Police Trooper Travis Hess.  Hess has testified that, after the collision, Clarke told him that he had recently "consumed 3 to 4 Sierra Nevada draft beers at the Sirloin Saloon in Manchester VT."  (Doc. 55-13 at 3.)[4]  According to Hess, the detail that the beers were "draft" beers must have come from Clarke at a time when the two spoke at Hess's office.  (Doc. 61-1 at 2.)  Hess has also testified that, at the barracks, VDLC inspector Jason Elmer interviewed Clarke.  (Doc. 63-1, Ex. 15, Hess Dep. 22:5–9.)  Hess further testified that he recalls Elmer saying that he obtained a receipt showing what Clarke purchased at the Sirloin Saloon.  (*Id.* at 23:9–17.)

It is undisputed that, on the same night as the collision, Elmer arrived at the Sirloin Saloon and met with the restaurant's general manager, Seth Dunne.  (*See* Doc. 55-7, Ex. 5, Dunne Dep. 12–13.)  The parties dispute the key details of Elmer's meeting with Dunne.  Defendants have presented Dunne's side of the story.  Dunne says that he showed Elmer receipts of all transactions for the evening of February 18, 2011, cash and credit, as well as a list of the employees' names, certifications, and contact information.  (Doc. 61-3, Ex. C, Dunne Aff. ¶ 7.)  According to Dunne, after reviewing the records of the transactions, he and Elmer "determined that no person meeting Mark Clarke's description had been at the bar that evening and no one had ordered Sierra Nevada draft

---

[4] At the April 10, 2014 hearing, counsel for the Schulmans noted that Clarke himself has not been deposed, asserting that he is outside of the Court's subpoena power, and has not responded to inquiries.

beers at any time that evening." (*Id.* at ¶ 8.) Also according to Dunne, the Sirloin Saloon served Sierra Nevada beers in bottles, but did not serve it on draft. (*Id.*) Dunne states that at the conclusion of their meeting, Elmer "advised that he was satisfied that Mark Clarke had not been at the restaurant that evening." (*Id.* at ¶ 10.)

The Schulmans, by contrast, maintain that Dunne's recent affidavit and deposition testimony are inconsistent with statements that they say Dunne made to Elmer shortly after the collision. In support, the Schulmans have presented an affidavit signed by Elmer, who states that "[d]uring my interview of Dunne, he acknowledged to me that Clarke had been at the Sirloin Saloon the night of the accident." (Doc. 63-3, Ex. 17, Elmer Aff. ¶ 4.) According to Elmer, "Dunne also told me that Clarke sat at the bar, ate a hamburger, and had two draft beers to drink. Based upon the information provided by Dunne, I concluded that Clarke had been at the Sirloin Saloon on the night of the accident." (*Id.*)

It is undisputed that Dunne later met with an insurance adjuster regarding the events of February 18, 2011.[5] According to Defendants, Dunne supplied the adjuster, John Eule, with all of the restaurant's documents relating to February 18, 2011—including the credit card report and check view details for every transaction, including those paid in cash. (*See* Doc. 61 at 4–5, ¶ 14; *see also* Doc. 55-7, Ex. 5, Dunne Dep. 16:7–21; Doc. 61-3, Ex. C, Dunne Aff. ¶ 11; Doc. 61-5, Ex. E, Eule Aff. ¶ 4.)

---

[5] There is some dispute (or at least a lack of clarity) as to when the meeting occurred. The Schulmans point to Dunne's testimony suggesting that it might have been as early as April 15, 2011. (*See* Doc. 55-1 at 13 & n.2; *see also* Doc. 55-7, Ex. 5, Dunne Dep. 30:4–24.) Citing the affidavit of the insurance adjuster, John Eule, Defendants assert that the meeting occurred in July 2011. (*See* Doc. 61 at 4, ¶ 11; *see also* Doc. 61-5, Ex. E, Eule Aff. ¶ 4.) Ultimately the precise date of the meeting is not material to the issues presented here.

5

Defendants assert that Eule then sent the documents to David Afton, a claims examiner for Defendants' insurer, First Mercury Insurance Company (First Mercury). (*See* Doc. 61 at 5, ¶ 15; *see also* Doc. 61-5, Ex. E, Eule Aff. ¶ 5.)

The Schulmans filed their Complaint in this case on July 3, 2013. (Doc. 1.) On December 2, 2013, Defendants served responses to the Schulmans' First Set of Interrogatories and Requests to Produce. (Doc. 34; *see also* Doc. 55-6.) In response to the Schulmans' request to produce "all financial documents related to [DWH] and [Saloon Beverage] for the period February 1, 2011 through March 1, 2011," Defendants supplied "Check View Detail Reports dated February 18, 2011, as well as the . . . Credit Card Detail Report dated February 18, 2011." (Doc. 55-6 at 3.) According to counsel for Defendants, her office had obtained those documents from First Mercury, which had obtained them from Eule, who—as described above—had in turn obtained them from Dunne. (Doc. 61-7, Ex. G, Cory Aff. ¶¶ 4–5.)

The Schulmans raised concerns about the completeness of the records produced. (*Id.* at ¶ 6.) Counsel for the Schulmans wrote counsel for Defendants on December 17, 2013 and requested "[a] complete copy of all documents provided by Seth Dunne to the insurance carrier." (Doc. 55-9 at 2.) After receiving follow-up requests (Docs. 55-10; 55-11), counsel for Defendants replied on January 29, 2014 stating: "Defendants have produced all documentation requested and available concerning reports of February 18, 2011 and reports of Seth Dunne to the insurance carrier. Because of the restaurant closure and the Bankruptcy Court proceedings, Defendants are no longer able to access or generate additional documentation." (Doc. 55-12 at 2.)

6

The Schulmans filed their Motion for Sanctions on February 8, 2014.  (Doc. 55.) In their Motion, the Schulmans note that the documents produced by Defendants in response to the First Set of Interrogatories and Requests to Produce included only 46 of the 116 checks that were created on February 18, 2011, and that none of the 50 checks that were created after 6:55 p.m. had been produced.  (*See* Doc. 55-1 at 5, 14.) Defendants say that, when the Schulmans raised concerns as to the completeness of the records produced, counsel for Defendants made numerous attempts to determine whether the records that had been produced were complete.  (Doc. 61 at 5, ¶ 18; *see also* Doc. 61-7, Ex. G, Cory Aff. ¶ 6.)  On February 13, 2014, Defendants requested and obtained records directly from Eule that contained additional information, including the details of transactions that occurred later in the evening of February 18, 2011.  (Doc. 61-7, Ex. G, Cory Aff. ¶¶ 7–8.)  Defendants provided a copy of those additional records to Plaintiffs on February 18, 2014.  (*Id.* at ¶ 8.)[6]  According to Defendants, their December 2, 2013 response did not contain all of the records because, "when the pages were scanned to be sent to Mr. Afton, those pages representing transactions from later in the evening may have been inadvertently excluded and were not sent to First Mercury."  (Doc. 61 at 5, ¶ 15; *see also* Doc. 61-5, Ex. E, Eule Aff. ¶ 5.)

Also on February 18, 2014, Counsel for Defendants emailed counsel for the Schulmans and inquired whether the Schulmans would withdraw their Motion.  (Doc. 61-

---

[6] Defendants have included a copy of the additional records as an exhibit to their Opposition to the Schulmans' Motion.  (*See* Doc. 61-8.)  According to Defendants, the records "establish that no patron dining alone was served three to four beers at the Sirloin Saloon on the evening of February 18, 2011, either with or without food, at the bar or in the restaurant."  (Doc. 61 at 7, ¶ 25.)

7, Ex. G, Cory Aff. ¶¶ 11–12.)  Plaintiffs' counsel responded that he would not withdraw it.  (*Id.* at ¶ 13.)

Defendants filed their Opposition to the Motion on March 4, 2014, arguing that the Schulmans have failed to meet the criteria for Rule 37 sanctions and that the Motion is moot because the allegedly missing evidence has now been produced, and in fact shows that Clarke was not served any alcoholic beverages at the Sirloin Saloon on the night of the accident.  (Doc. 61 at 1.)  Defendants contend that they should be awarded expenses they incurred in responding to the Schulmans' Motion.

In a Reply filed on March 17, 2014, the Schulmans seem to concede that the transactional records supplied by Defendants (including the recently produced additional documents) do not establish Clarke's presence at the Sirloin Saloon on the night in question, but maintain that that fact establishes that the records *were* destroyed or altered, because there is other evidence that Clarke was there.  (*See* Doc. 63-4 at 5.)  According to the Schulmans, that evidence includes the February 11, 2014 deposition of Vermont State Police Trooper Travis Hess (Doc. 63-1) and the March 12, 2014 affidavit of VDLC Investigator Jason Elmer (Doc. 63-3).  The Schulmans also seem to broaden the scope of their Motion, seeking sanctions for spoliation "and/or [Defendants'] failure to comply in a timely manner with an appropriate discovery request."  (Doc. 63-4 at 9.)

The Court granted Defendants' Motion for Leave to File a Sur-Reply (Doc. 67) on March 24, 2014.  (Doc. 69.)  In their Sur-Reply (Doc. 70), Defendants respond to the factual allegations in the Schulmans' Reply, including the Hess deposition and the Elmer affidavit.  According to Defendants, none of the Schulmans' factual allegations—

8

including the Hess deposition and the Elmer affidavit—support a finding of spoliation or the imposition of sanctions. Defendants suggest that Trooper Hess's account of Clarke's alleged admission to him that he had been drinking at the Sirloin Saloon is inadmissible hearsay. (Doc. 67-1 at 4 & n.2.) Defendants also assert that there are "significant questions" as to Elmer's credibility. (*Id.* at 5.)

## Analysis

### I. Spoliation

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). "A federal district court may impose sanctions under Fed. R. Civ. P. 37(b) when a party spoliates evidence in violation of a court order." *Id.* "Even without a discovery order, a district court may impose sanctions for spoliation, exercising its inherent power to control litigation." *Id.*[7] "A party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim." *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, 783 F. Supp. 2d 736, 740 (S.D.N.Y. 2011).

"[F]or sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence *actually existed and was destroyed*." *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010) (citation and internal

---

[7] Because of the Court's inherent power to control litigation, it is unnecessary to address Defendants' assertion, (Doc. 61 at 12), that there is no authority under Rule 37 to impose sanctions for the alleged spoliation. Whether under Rule 37 or not, it is appropriate to consider the merits of the Schulmans' spoliation claim. *See Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) ("Whether exercising its inherent power, or acting pursuant to Rule 37, a district court has wide discretion in sanctioning a party for discovery abuses . . . and for the spoliation of evidence.").

9

quotation marks omitted); *see also Fairview Ritz Corp. v. Borough of Fairview*, Civil Action No. 09-875 (JLL), 2013 WL 5435060, at *6 (D.N.J. Sept. 27, 2013) (belated discovery of document negated the finding of spoliation). Here, the parties disagree as to whether the transactional records were actually destroyed or suppressed. Defendants insist that they have now produced the complete and accurate set of those records for the evening of February 18, 2011. The Schulmans disagree, asserting that the records produced must be incomplete or altered because there is other evidence that Clarke was drinking at the Sirloin Saloon shortly before the collision. (*See* Doc. 63-4 at 5–7.)

The Schulmans' argument about contrary evidence is not persuasive. Here, the Schulmans have pointed to what they believe is evidence that Clarke was at the Sirloin Saloon,[8] and contend that the evidence contradicts the transactional records that have been produced, which appear to indicate that he was not. Conflicting evidence is not unusual in litigation; just because there is apparently a conflict does not prove that the transactional records must be incomplete or altered. The Schulmans' assertion to the contrary is speculation, and is insufficient to sustain their Motion. *See Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161, 177 (E.D.N.Y. 2007) ("[S]peculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence."). The Court declines to weigh the evidence or try the case in the context of the Schulmans' Motion for Sanctions.

---

[8] That evidence consists of Hess's anticipated testimony describing (1) Clarke's apparent admission that he had been drinking at the Sirloin Saloon and (2) that Elmer mentioned having a copy of a receipt he obtained, and Elmer's testimony recounting Dunne's statements to Elmer. The Court makes no ruling at this time as to whether the evidence that the Schulmans rely upon would be admissible.

The Schulmans also contend that, since the documents that were sent to First Mercury had been "scanned," then it should be possible to retrieve the original set of files that was transmitted to First Mercury to prove whether in fact some of the records were excluded from that original transmission. (Doc. 63-4 at 11.) The Schulmans fault Defendants for not supplying such proof, or other documentary proof that the records were indeed "inadvertently excluded" from the transmittal to First Mercury. That argument conflates the burden of proof on a spoliation claim. Defendants have supplied testimonial evidence that the records were inadvertently excluded from the transmittal to First Mercury. If the Schulmans dispute that assertion, they must supply contrary evidence; it is not enough to complain that Defendants have failed to also proffer documentary evidence.

The Schulmans assert that, in order to verify precisely what was transmitted to First Mercury, they intend to move the Court for leave to conduct depositions of Eule as well as an adjuster for First Mercury. (Doc. 63-4 at 11.) The Schulmans had ample time to take any depositions they thought might be necessary to support their Motion for Sanctions. A motion for leave to conduct additional depositions is not formally before the Court; the Court limits its decision to the issues that are currently before it.

Finally, at the April 10, 2014 hearing, the Schulmans suggested that the alleged loss or alteration of the records might have occurred even earlier in the chain than their transmittal to First Mercury.[9] According to the Schulmans, Defendants should have

---

[9] Consistent with that position, the Schulmans assert in their Motion that Defendants have failed to preserve "the computers and/or the information stored on those computers." (Doc. 55-1 at 6.)

11

preserved the electronically stored information ("ESI") on the restaurant's computers in its original format no later than April 21, 2011—since at that time DWH and Saloon Beverage had identified Norman Schulman as a creditor. The Schulmans argue that there is no way to confirm whether the documents that Defendants have produced accurately reflect what was on the computers. Defendants insist that the records that they have produced are facially complete; according to Defendants, they "printed and retained a complete set of the transaction records from the evening of February 18, 2011, prior to filing for bankruptcy." (Doc. 61 at 8.) For their part, the Schulmans maintain that, without access to the ESI in its original format, there is no way to confirm that the printed records are complete and accurate.

As to the original ESI, the spoliation prerequisite that the sought-after evidence actually existed and was destroyed is met. As to that ESI, it is therefore necessary to examine the elements of a spoliation claim. In order to obtain an adverse inference instruction regarding the loss or destruction of the original computer data, the Schulmans must establish:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quotation marks omitted). Defendants do not dispute that the transactional records are relevant—they go directly to the disputed issue of whether Clarke was at the Sirloin Saloon on the night of the collision.

Regarding the first element, "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). Here, Defendants were on notice of the Schulmans' claim at least as early as April 21, 2011—when Defendants filed for bankruptcy and listed Norman Schulman as a creditor. At that time, Defendants either knew or should have known that the ESI from the night of February 18, 2011 would be relevant to the litigation. *See Cornell Research Found., Inc. v. Hewlett Packard Co.*, 223 F.R.D. 55, 74 (N.D.N.Y. 2003) ("The mere fact that information which as a matter of ordinary course of one's business is electronically stored has been produced in functional equivalent, such as through hard copy, does not in and of itself excuse a party from producing the requested information in electronic form.").

The final element is an inquiry into whether the electronic records were destroyed with a "culpable state of mind." There is no fixed level of culpability on this element; instead, a case-by-case approach is employed. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 108 (2d Cir. 2001). Consistent with the case-by-case approach, "discovery sanctions, including an adverse inference instruction, may be imposed where a party has breached a discovery obligation not only through bad faith or gross negligence, but also through ordinary negligence." *Residential Funding*, 306 F.3d at 101.

Here, other than the general observation that the Sirloin Saloon went out of business, there are few details as to why the computers or ESI on them were not preserved. However, given that Defendants cooperated with the VDLC investigation and

13

with their insurer, and supplied records to the apparent satisfaction of both, their failure to preserve the original electronic data seems to be something less than deliberate destruction or bad faith. *Cf. Penberg v. Healthbridge Mgmt.*, No. 08 CV 1534(SJF), 2010 WL 2787616, at *7 (E.D.N.Y. Mar. 29, 2010) (despite being aware of defendant's concerns regarding the preservation of evidence, plaintiff "deliberately destroyed the majority of the files and/or possibly transferred them to another storage device"), *adopted*, 2010 WL 2787611 (E.D.N.Y. July 9, 2010). The Court concludes that Defendants' failure to preserve the original ESI falls on the "negligence" end of the spectrum of culpability.

Even though "[t]he sanction of an adverse inference *may* be appropriate in some cases involving the negligent destruction of evidence," *Residential Funding*, 306 F.3d at 108 (emphasis added), that sanction is not mandatory. The Court concludes that an adverse inference instruction would not be appropriate in this case because the Schulman's suggestion that they have sustained prejudice is based on conjecture. The Court has reviewed the printout supplied by Defendants (Doc. 61-8); the 62 pages of check details from February 18, 2011 appear, on their face, to include in detail all of the transactions for the relevant time period. The Schulmans have not articulated anything about the records themselves that suggests incompleteness or tampering. *Cf. Swift Transp. Co. of Ariz., LLC v. Angulo*, 716 F.3d 1127, 1135–36 (8th Cir. 2013) (trucking company's failure to preserve original digital satellite tracking data from its fleet was prejudicial because that made it impossible to verify the thoroughness and accuracy of the information on a printout prepared by the company's officer after performing a search

of the data; it was not possible to determine the focal point of the search or the size of the search radius).

Of course, the original ESI would have enabled the Schulmans to verify that Defendants "did not simply fabricate" the printout of the check details or otherwise tamper with it. *Swift*, 716 F.3d at 1136. Although the possibility of such nefarious conduct appears remote to the Court (especially in light of the facially complete 62-page check detail), the Schulmans were prejudiced to the extent that they cannot explore that possibility. Thus, although the Court concludes that an adverse inference instruction is not appropriate; evidence of the destruction of the ESI in its original format may be admissible at trial.

Defendants request an award of attorneys' fees incurred in responding to the Schulmans' Motion for Sanctions. According to Defendants, the Motion became moot once they supplied the complete set of records obtained from Eule, and the Schulmans unreasonably failed to withdraw the Motion before Defendants expended time preparing their Opposition. The discussion above explains why the Schulmans did not withdraw their Motion: they believe that the transactional records are still not complete. The Court concludes that the Schulmans had a nonfrivolous reason for pressing their spoliation claim. The Court therefore declines to award Defendants the fees they incurred in preparing their Opposition.

## II.     Discovery Obligations

As noted above, the Schulmans have indicated that, in addition to their spoliation claim, they seek sanctions because, according to them, Defendants violated their

15

discovery obligations. (*See* Doc. 63-4 at 9.) The Schulmans say that they first brought the missing documents to Defendants' attention on December 17, 2013, but that Defendants did not investigate or produce the additional records until after the Schulmans had filed their Motion for Sanctions. (*Id.*) According to the Schulmans, "Defendants' dilatory and evasive tactics necessitated Plaintiffs' motion for sanctions." (*Id.*)

Even where sanctions for spoliation are not warranted, it can be appropriate to impose sanctions on alternate theories in some cases. *E.g.*, *Fairview*, 2013 WL 5435060, at *6 (concluding that sanctions predicated on spoliation could not apply because the document at issue was ultimately produced, but noting that "the manner in which Plaintiff's counsel handled the document necessitated protracted litigation at a cost to Defendants" and that "[u]nder those circumstances, it would be manifestly unfair for Plaintiff counsel's belated production of that document, and narrow aversion of spoliation, to preclude consideration of alternate theories by which Defendants may be entitled to recompense . . . .").

The Court concludes that sanctions are not appropriate in this case. Pursuant to Fed. R. Civ. P. 26(e), Defendants were required to supplement their December 2, 2013 responses to the Schulmans' First Set of Interrogatories and Requests to Produce "in a timely manner" after learning from the Schulmans' December 17, 2013 letter that the responses might be incomplete. Defendants' initial response—dated January 29, 2014—was that no more records were available. However, on February 18, 2014—ten days after the Schulmans filed their Motion for Sanctions—Defendants produced the additional records.

Defendants succeeded in producing the additional records within about eight weeks of the Schulmans' December 17, 2013 letter, and prior to the March 31, 2014 discovery deadline in the Third Amended Stipulated Discovery Schedule/Order (Doc. 46). At the April 10, 2014 hearing on the Schulmans' Motion, counsel for the Schulmans conceded that the eight-week delay was *de minimis*. The Court concludes that Defendants' supplementation was completed in a "timely manner." *See Grivois v. Wentworth-Douglass Hosp.*, Civil No. 12-cv-131-JL, 2014 WL 309354, at *16 (D.N.H. Jan. 28, 2014) (supplemental disclosure was timely under Rule 26(e) when it was completed less than three weeks after obtaining additional information, and nearly two months before the close of discovery). To the extent that the Schulmans' Motion for Sanctions provided additional motivation to locate the records, it seems to have been successful on that score.

## Conclusion

For the reasons stated above, Plaintiffs' Motion for Sanctions (Doc. 55) is DENIED.

Dated at Burlington, in the District of Vermont, this 18th day of April, 2014.

/s/ John M. Conroy  
John M. Conroy  
United States Magistrate Judge
